Good morning. The first matter for argument this morning is InReDDMG, the state et al. Ms. Fenning. Good morning. I'm Lisa Fenning of Arnold and Porter on behalf of Disney. Ms. Fenning, you have reserved how much time for rebuttal? Seven minutes for rebuttal. All right. Now, this appeal is a de novo review and requires this court to take a fresh look at the contract provisions in question. The only question before this court is whether that provision grants Disney protection against being sued for patent infringement. Now, what is that provision? Are you talking about the 16A? I'm talking about 16A, Your Honor. Yes. 7A and 7B have already been allowed. Could you start out, for my benefit anyway, just with a description of the structure of this contract, most importantly the relationship, what 16A says, I understand 16B is really no longer at issue in this litigation. Correct, Your Honor. As well as 7A and the interrelationship between them. This contract was the first contract between these parties and it did two things. It defined exactly what was happening with respect to the G-Force film for which the N3 folks were making a conversion of 17 minutes of the film to 3D. And it also set the basis for future relationship between the companies. Section 3 describes a contemplated five-year relationship. For other films? Other films. There was expected to be other films. There is a first offer requirement promise that, hey, if we do other conversions, you have a first crack at it. 7A is a covenant not to sue that protects Disney for using the work that was actually created by N3 in its films and its distribution of the movie. 7B is a direct license to Disney so that Disney could make other iterations of various forms of G-Force. For example, if there needed to be some conversion done to make it suitable for a different kind of format of presentation. Those related to the G-Force agreement. 16A is a much broader provision. But isn't it limited by Section 3 to five years? You were just talking to us about an ongoing relationship of five years as set out in Section 3. So to the effect that you are arguing that Section 16A provided a license, isn't that limited in your argument by Section 3 to a term of five years? No, Your Honor. It doesn't have a five-year limit. In fact, the license covered the entire period of the patent. Not infinite. Well, patents are not infinite. And indeed, there was only a few years beyond the five-year term remaining on the particular patents in question because they related back to 1998. So it's not like there was a 50-year provision. It was approximately eight years that were remaining on the patents. So it would have extended beyond the five-year period. But the point is that you don't have to get down and dirty with either the bankruptcy process, there's no bankruptcy question here, or with the exact scope of these provisions because if it is a license and it is by its terms a grant of protection against an infringement suit, then it is protected with respect to future owners. Well, then why in subsequent contracts, for instance, Alice in Wonderland, were there similar provisions against suit for infringement incorporated? The other contracts, future contracts related to the ability to use in three, or then its successor, digital domains, work that was done on that particular picture. Wasn't that covered by Section 16A? No, no. Section 16A does not relate to the work that was done by in three or its successor digital domain. It related to work done by third-party vendors, other companies. For example, if Prime Focus were retained to convert from 2D to 3D and Disney then used that film, that converted film, as part of a picture that was being released and the theaters aired that film and DVDs were sold, it's the use of the work by third-party vendors, not the work of in three or two people. beyond providing Disney with protection against suit for the work and or infringement of these third parties? It protects it against the kind of suit that was at issue in the General Talking Pictures case, the Supreme Court case. In that case, the General Talking Pictures used the amplifiers made by the manufacturer to lease them to the theaters to show Talking Pictures. General Talking Pictures was the customer. It didn't make the amplifiers. It leased them, used them, and was sued, and the infringement action against it as the customer was upheld by the Supreme Court. Disney didn't want to be sued if it used the work done by Prime Focus on another one of its pictures. It didn't want to be sued for infringement if Prime Focus somehow violated the license. Now, Prime Focus or any of the others would have to get their own license if they wanted to use this patented technology. They weren't protected against being sued. Disney didn't want to have to worry about whether its vendors had the right to use this technology. But that didn't give any other rights to Disney, other than the fact they had the confidence they wouldn't be sued if one of their vendors who was given access to the company's IP misused it in some way. That's all it did. Right. It didn't give them a license to use the IP for something outside of the GeForce film. Yes, it did. It was not limited to GeForce. If that's what 16A did, why did you need 16B? Oh, 16B? 16B would have allowed Disney to do 3D conversions in-house. Okay, so what does 16A then, I think, go back to this question. Tell us how 16A allowed Disney to take the intellectual property they had access to, to 3D, the GeForce film, and use it outside of GeForce. 16A allows Disney to use the work product of other vendors without having to worry about whether those vendors, in their performance of their conversion work, violated these patents. How is that a license? How is that a license? Covenant not to sue is a license. I mean, the license in General Talking Pictures, the manufacturer had a license, but not for the particular use. The customer in General Talking Pictures used the work product and got sued for using the work product that was beyond the scope of the license. Disney doesn't want to have to worry about it. It wants to be protected against that kind of infringement suit. A protection against a patent infringement suit is a license. Real D does not cite a single case holding that a covenant not to sue was not a license. They all hold they are a license because that is the essence of a license. It is only a covenant not to sue. A patent gives you a right to exclude others from using it. It doesn't give you an affirmative right, and therefore carving off a piece of the patent and saying you cannot use it that says you cannot sue, that is a license. If 3D purchased the patents subject to the provisions of Paragraph 16A, would Disney be happy? Yes. That is all that we're asking. We are not asking you to interpret exactly what the scope is. We are just saying it is subject to that. If Real D wants to sue sometime off in the future, the exact scope can be determined based upon whatever the alleged infringing acts are. All right. We will have you back in rebuttal. Seven minutes is a considerable amount of time to reserve for rebuttal. Thank you. The red light is on. We will have you back. Ms. Fenning. Ms. Forster. Good morning. May it please the Court, Paige Forster for AFL-E, Real D, Incorporated. I'd like to first address my colleague's remarks repeatedly that this Court need not decide the scope of 16A. That's wrong for a variety of reasons. There are actually several. The first one is that Disney says in its reply brief that the scope of 16A was raised for the first time on appeal. And it says that's one of the reasons why the Court- They say that in the reply brief, I think. They do. They say it in the reply brief at pages 10 to 13. But the record demonstrates that Disney actually raised the scope of 16A in the bankruptcy court, and the parties litigated it. And I'd like to provide a few record sites to demonstrate that. JA-578 is where Disney writes a letter to the bankruptcy court requesting reconsideration of its letter ruling that 16A applies only to the two films. And in its letter, Disney tells the bankruptcy court that the ruling is too narrow. And it says that 16A rights, quote, are not limited to the GeForce film. JA-584 is where the debtors oppose that broad request that Disney makes in its reconsideration letter. And then JA-600-601 is part of the hearing transcript. And this hearing was in the bankruptcy court on December 17th. It was after the sale of the patents had been approved, and it was after Disney had filed its reconsideration letter with the court. So all of the parties' briefing and all of the parties' positions were on the table. And at that hearing, after Disney's reconsideration request, the debtors say on the record, JA-600-601, to the extent that Disney is now trying to use the Section 16A language to protect any work done by third-party vendors on any film by Disney, we absolutely oppose that. And then interestingly, Disney asserts in its reply brief that Real D somehow arrived at its belief about the limited scope of 16A on appeal. And that's not even true because at JA-603, the bankruptcy judge articulates that 16A applies only to GeForce, not all Disney projects going forward. And then the bankruptcy judge says he wants some measure of comfort that this understanding of 16A is consistent with Real D's expectations because at this point, Real D is the winning bidder. It's represented in the courtroom, but the sale hasn't closed yet. Does Real D, would Real D have any objection to buying the patents subject to 16A? Well, interestingly, Your Honor, Real D actually did buy the patent subject to 16A. The bankruptcy court letter ruling says that the Section 16A rights travel with the patent insofar as GeForce and Alice in Wonderland. And it says that because the parties stipulated to it. Well, but I'm asking, would they be, what would be their objection to buying the patents subject to 16A as applied to all films during the life of the patents? Because that's not what the GeForce agreement provides for. That's not my question. Why would they object to buying the patents subject to 16A applying to all films, third-party vendors, third-party providers, not just subject to GeForce and Tron, but subject during the life of the patent to any suit brought for infringement by third-party providers to Disney? I think that the answer to that question is that it would lessen the value of the patents that Real D purchased at auction in the bankruptcy court because essentially it would give Disney a free pass to induce infringement by its vendors going forward in perpetuity for the life of the patents. And Disney would be immune from suit. So it would actually make Section 16B not technically superfluous, but confusing. I think Judge Schwartz referred to why 16B if 16A is what you say. And that's an awfully good question because if 16A is what Disney says, then why would Disney even bother to negotiate to buy something that it could get for free as long as it worked through a third-party vendor under 16A? That wasn't what the agreement was, and it isn't what the language signifies. Well, the provisions of 16A even make them sound like they're an excuse for Disney to involve in questionable dealings. And yet in the original agreement, if it is as Disney promotes it, there was no problem with considering that 16A, that Disney might attempt to induce infringement under 16A. I mean, is the record of that type of improper activity so rampant in the movie business that we should expect it to be a problem in the sale of patents? Well, the record doesn't address that issue, and so therefore I think, as you're pointing out, it's not within the scope of what's being decided here. I think the idea that Disney could induce infringement by its vendors is simply the logical outworking of what the language would signify if it is what Disney says. But Judge Roth asked a practical question here, and I understand the record doesn't speak to it. In fact, there's very, very little record here because there was very little process done below. But the question about whether or not this is rampant in the industry may be of some practical interest to us. Can you speak to that? I can't speak for my colleagues here, but I'm not exactly a Hollywood type. Nor am I. Nor am I, however, having flown in from Pittsburgh. Well, she's from Jersey, so she's much closer to the point. Indeed. Indeed. It would be perhaps a matter of interest if this kind of inducement is rampant in the industry. Frankly, it wouldn't change the words of what the agreement says, and we know that extrinsic evidence can't be admitted to vary or change or add to the terms of the agreement. So while it might be interesting, I don't think it bears directly on the interpretation of 16A. That also leads me to another issue that you raised. Is it a concern, though, under 16A? Is the possibility of inducing? I think it's not a concern because 16A is limited to the G-Force film. Why do we have 16D, then? And 16D is the... The provisions of Section 16 will outlive the relationship for the G-Force film. Right, and that's because the G-Force film could continue to be exploited many years into the future, and Disney wanted to ensure that no matter how its third-party vendors worked on G-Force in the future, Disney wouldn't be sued based on potential infringement. And in the whole context of the contract, we can see that the parties contemplated that G-Force might continue to be exploited and worked on well into the future, and in fact Section 7 talks about means of exploiting the G-Force film that haven't even been invented or thought of yet. And so that's why I think Judge Roth's Section 16D provides that for as long as Disney is exploiting the G-Force film through its third-party vendors, adding technology and re-releasing it in ways that we can't yet foresee, Disney will be immune from suit based on its vendors' infringement of any patent that N3 might possess into the future. Can you walk me through how you look at 16A as only protecting Disney for work of its vendors arising from the G-Force film, as opposed to all IP that might have been available to it? And if I could just add to that, can you point to language, in addition to walking us through, of limitation within 16A? Language of limitation and walking through, okay. Which I think is the same question. Is there some plain language in the contract that would tell us 16A applies only to the G-Force film and the IP that one used to make it 3D for G-Force and G-Force alone? And if there's no plain language in the clause, then is there something else reading the contract as a whole which we must apply in California law? How we conclude this is a G-Force only 16A provision? Right. And I think if you're looking for the limiting language inside of 16A itself, it's not there in the sense that 16A provides that N3 will not pursue any claim or cause of action or otherwise assert any company IP against Disney or its affiliates, respective customers, agents, distributors, based on work for any of the producer parties by a third-party vendor, period. So that's the end of the sentence. And Disney harps quite a bit on the fact that the picture is not included in that clause. The fact is it doesn't need to be because when we read the contract as a whole, as we're required to do, Section 7B gives Disney a license to use N3's work on the film to exploit it and to make money from it. Section 16A works in tandem with that, and it allows Disney to use work by other vendors on G-Force. And so Disney then has protection for all of the G-Force film and won't be sued based on any infringement by itself or its third-party vendors of the patents. And that's how you arrive at the reading as a whole. And then from your point of view, 16B covers what? 16B covers, as Ms. Fenning said, if Disney wants to do the work in-house. So then if Disney had triggered its option, the parties would negotiate and Disney would then be able to work not through third-party vendors but to actually use N3's patents itself to perform conversion work. Beyond G-Force? Beyond G-Force, that's right. And we can see that in the language of Section 16B, which says that they'll negotiate for a non-exclusive, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any service. So that's when the parties want to signify a license, which they do in Section 7B, and they do in 16B, they absolutely know how to do it, that broad, perpetual, worldwide license right to have, use, make, sell. None of that language is in 16A, and that's because it's not a license. 16A grants no one the right to infringe. So you think there's a difference between a covenant not to sue and a license? Even though the case law seems to say they're the same because of what they permit or don't permit someone to do. Real D agrees that a covenant not to sue is the essence of a license. What the case law says, and Disney cites it over and over, is that a non-exclusive patent license is equivalent to a covenant not to sue. What Disney really needs here is the reverse. They need a case saying that a covenant not to sue is a non-exclusive patent license. And there's no case saying that. That case doesn't exist. What the cases say is that whether a covenant not to sue grants a license or doesn't grant a license depends on the language of the covenant not to sue. It's that contract construction exercise that we're all engaged in. So TransCore, the case that Disney relies on a great deal, says that the real question here is not whether it's denominated a covenant not to sue or a license. The question is what do the parties agree to, and that's the task here. I'd like to refer back to Judge Smith's comment that there was little process here. I understand that this was an expedited process when the patents were sold. I'd like to point out that actually in Disney's opening brief, they say after ample briefing and hearing, the sale was approved, and then only in the reply brief does Disney turn around and start saying that the process was insufficient. But actually there was voluminous briefing. There was no evidentiary hearing, for example. There was no hearing, as Disney has pointed out, that would have provided an opportunity to offer parole evidence, for example. There were two hearings, and Disney, in conjunction with its objection, had the right to make a record. It had the right to put in its evidence. It had the right to depose witnesses. It didn't do any of that. I was not suggesting any default on anyone's part. I was simply saying, relatively speaking, it seemed to me that there was a rather abbreviated process here. And there was an abbreviated process, perhaps in the sense that bankruptcy process typically is abbreviated. At the very least, less formal. Yes. But the voluminous briefing of the parties is in the joint appendix, and Your Honors know how long that is. There were two hearings. There was a hearing to approve the sale of the patents, and there was a second hearing after Disney had put all its cards on the table about what it thought 16A really applied to, and there was an opportunity for argument before the court. And the bankruptcy court's letter ruling is well-reasoned and thorough, and it really takes into account the case law that Disney cited and all of Disney's arguments. I'd like to also just point out that there is a motion to strike on the record, and that Disney has admitted in its opposition to that motion that the documents that it cites are not in the record, and for that reason we believe that motion should be granted. These are the other agreements? That's right. Disney would like the court to lay the G-Force agreement next to these other agreements that the court can't see and to decide what G-Force means based on this extrinsic evidence that it didn't put into the record when it could have. Thank you very much. Ms. Fenning, we'll have you back in rebuttal. I think it is important to understand the nature of the sale process in a bankruptcy case only for context. It is a summary proceeding. What you buy at a bankruptcy asset sale is what you get. It's like buying a pig and a poke. You don't litigate exactly what the rights are. You get whatever package of rights exist. At some later point, if somebody wants to take patents they have bought at a bankruptcy auction sale and try to enforce them, they bring an infringement action. In the course of an infringement action, you would get into the actual specifics of the use and whether it violated the terms of the agreement. You might get into parole evidence about what the intent of the parties was as to the scope of the agreement. None of that kind of thing happens during the sale process. The only issue before the court was whether the sale should be subject to preexisting licenses and not exactly what the scope of them was. And I say that because we did not offer evidence as to the intent and history of the negotiation of this agreement because that was not the issue before the court. The issue before the court was the fact that there was an agreement out there and whatever the agreement says is subject to the agreement to the extent the agreement creates the license. Didn't the bankruptcy court spend some time talking about the means and bounds of the license? It did. It's not like it was a pig and a poke. There was a fulsome discussion and an adversarial process where people debated what was being sold. And you have a bankruptcy judge who made findings. There was lots of argument. But there were also findings. There was no discovery and there was no depositions. None of the kind of procedural history you would expect if people are contesting the underlying terms and conditions of a contract as to the scope, intent, negotiation history of a contract. None of that's part of the sale process. Lots of argument. No evidence. Wouldn't that issue, and I'm not trying to be rude when I say that, but if Disney hadn't raised the issue in the bankruptcy court, if the issue of the scope of the license had not been raised in the bankruptcy court, would that not be still alive to raise in any subsequent infringement action? But now that it's been raised, don't we have to decide it? Not exactly. We explained that there were four elements of license in various forms included in this agreement. We wanted to be sure that this would not be deemed to be a sale free and clear of the four elements of the licenses that were provided in this agreement. So we explained what those four different protections were. And we sought an order that said the protections, whatever they are in this agreement, the sale is subject to them because they have the character of being a license. We did explain all of that, and we did argue that. We were not contesting an infringement action about specific scope. We were not getting into negotiation history over the contract. One normally wouldn't do that. We raised it because the law is unclear. The case law is unclear about whether we would have a right to raise it later in an infringement action because of the 363F provisions of the code that provide for a sale free and clear. So that's why we raised it. We wanted it to be clear in the order that whatever the license provisions are in this agreement are still the license provisions a day after the sale. That's why we felt we had to raise it. We explained the different provisions. It would have been fine if the bankruptcy court said, okay, whatever the license provisions are that are in this agreement, I don't have to figure it out. The sale is subject to whatever is an enforceable license under the patent law. That's all the bankruptcy court needed to do in order to reach the result that we were trying to reach. The bankruptcy court went further and dealt with this in a hypothetical basis, saying I'm trying to figure out what 16A covers. I can't get it. Why is it not fair for him to have interpreted the clause so that he made clear what the purchaser was getting? Why was that wrong? He gets the fact you disagree with the interpretation, but why was that an incorrect exercise of his authority? As far as what the bankruptcy court did, we were fine reading the opinion, all the letter ruling, all the way to the last sentence where he made a logical leap that was impermissible. He says, okay, it's a covenant not to sue and it protects Disney if it uses work by vendors and so forth. And then he said, but it's too narrow to constitute a license. Or another way of trying to figure out what he was saying, either he thinks it's the same as 7A and B protections. Well, it's not the same as 7A and B. You read the text of it, it's clearly not the same. It's not the same as 16B. There were four complementary provisions. If we should agree with you, what do you want us to do? What I want you to do is to say that whatever the license provisions are, however broad or narrow the scope of 16A, the sale was subject to it because it grants a protection against patent infringement suits and therefore it's a license. This happens to be in the context of giving a protection to a customer against being sued for use of product created by its vendors, but that's an important protection, as the general talking picture shows. We want that to be your ruling, that this was a preexisting license and that it was subject to this license and that it remains to other courts to figure out the exact scope. Real D will say, well, we can't know the value of what we're buying unless we have this section interpreted. Well, Real D opted to go forward and close the sale instead of waiting to find out exactly what the scope was. We sought a stay pending appeal so that we could get this litigated before the sale closed. Real D opposed that and ultimately we stipulated to the idea that whatever this court's ruling is in favor of Disney, in favor of Real D, whichever way it comes out, Real D wanted to close and would be taking it subject to whatever the ruling is of this court. So you're dumping it on us. They bargained for that. No, no, Real D made the decision. Yeah, certainly. Thanks very much. Thank you. And thank you to both the counsel. We'll take the case under advisement.